# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

**DUSTIN LEE ESTEP,**

**Plaintiff,**

**v.**                                              **Case No.: 3:11-cv-00487**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

**Defendant.**

## <u>MEMORANDUM OPINION</u>

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. (ECF No. 2). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 12 and 13). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 14, 15).[1]

The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

---

[1] ECF Nos. 14 and 15 are the same document—Defendant's Brief in Support of Judgment on the Pleadings. ECF No. 15 is a reformatted version of ECF No. 14. The Court will henceforth refer to ECF No. 15 when citing Defendant's Brief in Support of Judgment on the Pleadings.

## I.    <u>Procedural History</u>

Plaintiff, Dustin Lee Estep (hereinafter "Claimant"), filed applications for SSI and DIB on March 15, 2007 (Tr. at 104–08, 109–11), alleging a disability onset date of November 30, 2006 due to attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, post-traumatic stress disorder ("PTSD"), and thin membrane disease of the kidneys. (Tr. at 142). The Social Security Administration ("SSA") denied Claimant's applications on July 19, 2007. (Tr. at 50–54, 55–59). Claimant filed a request for reconsideration, which was also denied on November 14, 2007. (Tr. at 72–74). Claimant then requested a hearing in front of an Administrative Law Judge (hereinafter "ALJ"), which was held before the Honorable Andrew J. Chwalibog on November 4, 2008. (Tr. at 26–45). By written decision dated July 1, 2009, the ALJ denied Claimant's SSI and DIB claims. (Tr. at 12–25). The ALJ's decision became the final decision of the Commissioner on December 10, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 3–7). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (ECF Nos. 8, 9, 11, 14, 15). Consequently, the matter is ripe for resolution.

## II.   <u>Relevant Evidence</u>

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute or provide a clearer understanding of Claimant's medical background.

A.    **Treatment Records**

1.    **Prior to Disability Onset**

Over the course of 1993 and 1994, Claimant underwent five comprehensive psychological evaluations at Prestera Centers for Mental Health ("Prestera"). (Tr. at 200–02, 203–05, 206–08, 209–11, 212–14). Claimant exhibited numerous behavioral and emotional problems, including hyperactivity, a short attention span, and frequent temper tantrums. Multiple treating sources found that Claimant's interpersonal skills, communication skills, and estimated intellectual level were average. He was diagnosed with bipolar disorder, not otherwise specified ("NOS"), ADHD, and oppositional defiance disorder. For treatment, Prestera staff recommended psychotherapy and medication.

On March 11, 1996, when Claimant was nearly ten years old, he returned to Prestera for an updated comprehensive psychiatric evaluation. (Tr. at 198). The evaluating psychiatrist documented that Claimant's behavior was cooperative; his affect and mood were appropriate; his memory was intact; his speech was coherent and relevant; he had no homicidal or suicidal ideation; and he denied experiencing any hallucinations or delusions. (*Id.*). Several years later, on February 13, 1999, Claimant received another comprehensive psychiatric evaluation at Prestera. (Tr. at 199). On this occasion, Claimant was observed to be cooperative and verbal, but appeared slightly anxious and nervous. (*Id.*). His memory was intact; his speech was coherent and relevant; he demonstrated fair insight and judgment; and he denied any suicidal or homicidal ideation, delusions, and hallucinations. (*Id.*).

On August 20, 2002, at age sixteen, Claimant was involuntarily admitted to River Park Hospital on his mother's petition. (Tr. at 250–58). He was initially assessed by Dr.

Charles Clements, who recorded the reasons for the admission to include depression, stealing drugs and money, self-mutilation, and setting fires. Dr. Clements performed physical and neurological examinations, which revealed no objective evidence of abnormalities. Dr. Clements provisionally diagnosed Claimant with depression, tension headaches, and back pain. (*Id.*). He recorded that Dr. Stephen Edwards was the attending physician assigned to the case and would follow-up with a mental status examination of Claimant. Claimant was admitted to the Adolescent Unit, where he received medication as well as individual, group, and family counseling until his discharge on August 27, 2002. At the time of discharge, Claimant was diagnosed by Dr. Edwards with chronic PTSD; history of abuse; oppositional defiant disorder; cannabis abuse; and borderline personality traits. (Tr. at 250-54). Dr. Edwards noted that Claimant had a history of aggressive behavior with one prior psychiatric admission at seven years of age and had been receiving outpatient psychological care from Prestera, although Claimant refused to speak with a therapist. Dr. Edwards felt that Claimant's condition had improved, but recommended that he continue with outpatient psychotherapy. Claimant was prescribed Depakote, Paxil, and Clonidine and was referred for outpatient care.

Three days later, on August 30, 2002, Claimant was again brought to River Park Hospital for complaints of major depression and reports of suicidal ideation. (Tr. at 246–49). Dr. Clements conducted the initial assessment and noted that Claimant had recently broken up with his girlfriend. (Tr. at 246). Claimant's physical and neurological examinations were normal. Dr. Clements diagnosed Claimant with recurrent and severe major depression, chronic back pain, chronic tension headaches, and chronic chest pains. (Tr. at 249).  Claimant was admitted to the services of Dr. Edwards.

On September 3, 2002, Dr. Edwards discharged Claimant with medications and instructions to receive follow-up care. (Tr. at 242–45). Dr. Edwards attributed Claimant's acute suicidal thoughts to the problems he was having with his girlfriend. Dr. Edwards noted that Claimant had responded well to therapy and medication in the hospital setting and was improved at the time of discharge. (*Id.*).

On December 2, 2002, Claimant was readmitted to River Park Hospital pursuant to a court order. Claimant had been complaining of suicidal ideations as well as homicidal thoughts toward "people who abused me," which included workers at the Salem Detention Center where Claimant had been residing since his discharge from the hospital in September. (Tr. at 225–28). Claimant's physical and neurological examinations were normal and he was referred to Dr. Edwards for inpatient care. Claimant remained hospitalized until January 13, 2003. (Tr. at 218-224). During the admission, Claimant received medication and psychotherapy, although he was not always compliant with the treatment plan. At the time of discharge, Claimant was diagnosed with depression, NOS; conduct disorder; chronic PTSD; ADHD; history of abuse; and cannabis abuse. He was noted to have antisocial traits. Dr. Edwards also observed that Claimant could be "very somatic in medication seeking, especially for pain medications." He was transferred from the hospital to the Barboursville School for residential care and education. (*Id.*).

Claimant's intake evaluation at Barboursville School was conducted by Patricia Kelly, M.D., on January 13, 2003. (Tr. at 235–41). Dr. Kelly noted that in the past eighteen months, Claimant had become increasingly difficult for his mother to control; acting defiant, stealing, and engaging in substance abuse. He had been caught with marijuana at school, which led to his suspension and, a few months later, his first of

5

three admissions to River Park Hospital. Dr. Kelly diagnosed Claimant with bipolar disorder NOS; PTSD status post-abuse; ADHD, conduct disorder, substance abuse, kidney disease, right knee pain, lower back pain, headaches, and chest pain. (Tr. at 240–41). After two months at the Barboursville School, Claimant's educational performance was evaluated. (Tr. at 260). Claimant's math teacher noted that he put forth great effort and was a good student. Claimant had all A's and B's in English, Geometry, Science, History, Health, and Physical Education. (*Id.*). On April 3, 2003, almost three months after his admission to the Barboursville School, Claimant was discharged to placement at Pressley Ridge, a residential treatment center for troubled children. Dr. Holly Clark completed Claimant's discharge summary from the Barboursville School. (Tr. at 230–34). She noted that Claimant had been admitted to the Barboursville School on a court order and had a history of suicidal and homicidal thoughts. (Tr. at 230). Dr. Clark observed that Claimant was sensitive to criticism; overreacted to minor problems; trusted no one and was guarded in his social interactions; blamed others; and avoided responsibility. (Tr. at 232). Dr. Clark diagnosed Claimant with bipolar disorder NOS, ADHD, PTSD, and oppositional defiant disorder. (Tr. at 233). She indicated that Claimant had shown improvement during his stay at the school and his mood was now stable. (*Id.*). Claimant also demonstrated an improved attention span and a willingness to cooperate with staff and peers. (*Id.*). Dr. Clark's discharge prognosis for Claimant was "fair." (Tr. at 234). According to Dr. Clark, Claimant needed a stable environment with direct consequences for his behavior to facilitate his recovery. (*Id.*).

From May 2003 through March 2005, Claimant was seen by Dr. Edwards on 17 separate occasions. (Tr. at 285–92). During this period of time, Claimant's mental health was relatively stable. On May 8, 2003, Claimant was "doing well" and on June 12,

2003, he reported that he had not been having any problems. (Tr. at 292). On July 7, 2003 and August 19, 2003, Dr. Edwards again noted that Claimant was doing well. (Tr. at 291). In November 2003 and January 2004, Claimant reported having difficulty focusing and sleeping, but stated that he was doing "all right." (Tr. at 290). On April 6, 2004, Claimant reported that he was feeling moody and irritable secondary to medication and was still having trouble sleeping. Dr. Edwards observed that Claimant's mood was nonetheless stable. (Tr. at 289). In June 2004, Claimant complained of feeling nervous and requested Valium.  (Tr. at 288). Dr. Edwards prescribed a trial of Neurontin with Seroquel.  In September 2004, Claimant indicated that he was doing all right, but felt he needed a higher dose of Neurontin. On December 21, 2004, Claimant reported that he was doing well with his medication changes and his grades were improving in school. (Tr. at 286). He expected to graduate in January and find a job as a machinist. On March 8, 2005, Claimant informed Dr. Edwards that he had graduated from high school, was working in a fast food restaurant, and was planning to attend trade school. (Tr. at 285). Claimant was sleeping better, and his mood was observed to be stable.

On September 14, 2006, Claimant was taken to St. Mary's Medical Center after being confronted by law enforcement officers and making suicidal threats. (Tr. at 409–15). The triage assessment included a note stating that Claimant had not been on his regular medication for two years and had taken three Xanax earlier in the evening. (Tr. at 409). Claimant's mother reported that Claimant had left home the prior evening around midnight with thoughts of harming himself or someone else. He did not return home and failed to meet her for lunch as they had planned. (Tr. at 412). She spent the day searching for Claimant and eventually contacted one of Claimant's friends who

7

reported that Claimant was cutting himself. (*Id.*). When Claimant's mother arrived at the friend's house, the police were already there. (*Id.*). Lab results revealed an ETOH level of 10 and Claimant's drug screen was positive for barbiturates, benzodiazepine, cocaine, THC, opiates, and oxycodone. (*Id.*). The Emergency Department physician diagnosed Claimant with suicidal and homicidal ideations and polysubstance abuse. (Tr. at 413). Claimant was too lethargic from his medication intake to undergo a psychiatric evaluation, so he was held in the Emergency Room until he became more alert.

The next day, on September 15, 2006, Claimant underwent a psychiatric intake and assessment. (Tr. at 396–405). Claimant denied that the events of the previous day had been a suicide attempt. (Tr. at 396). Instead, he stated that he had flashbacks of childhood abuse when the police handcuffed him, which greatly upset him and caused him to react inappropriately. (*Id.*). Claimant's mother spoke with the therapist and advised that Claimant was unable to get along with people or hold down a job. She indicated that Claimant's quick temper and proclivity to "party" caused him to lose employment positions. Nevertheless, based upon a psychiatric evaluation, Claimant was not found to require hospital admission; instead, he was instructed to seek outpatient or residential treatment. (Tr. at 404).

### 2.    Relevant Time Period

On July 4, 2007, Claimant was admitted to the emergency room at St. Mary's Medical Center after being struck in the head and back with a tire iron during an altercation. (Tr. at 342, 344–45, 472–74). He admitted that he had been drinking prior to the fight. The Emergency Department physician documented that Claimant had a laceration on his head and had been pepper sprayed by the police. (Tr. at 342). Claimant reported that he lost consciousness after being struck. (*Id.*). X-rays of Claimant's head

revealed no significant abnormalities, and a CT scan of Claimant's cervical spine showed no evidence of cervical spine fracture or subluxation. (Tr. at 347–48). Claimant's head wound was sutured and he was discharged with instructions to shower in order to remove all remnants of the pepper spray. Due to his acute alcohol intoxication, he was released to his family for transportation home.

On August 25, 2007, Claimant returned to the emergency room with complaints of vomiting, diarrhea, and difficulty urinating. (Tr. at 340–41, 343, 499–501). Claimant was diagnosed with a urinary tract infection, urethritis, and gastroenteritis. (Tr. at 343). His Emergency Room visit was noted to be "uneventful." Claimant was discharged with prescriptions and told to follow-up with his family physician.

### B. Agency Assessments

### 1. Physical Health Assessments

On May 10, 2007, Kip Beard, M.D., completed an internal medicine examination of Claimant at the request of the West Virginia Disability Determination Service. (Tr. at 297–301). Claimant reported that he had been diagnosed with thin basement membrane disease when he was approximately 15 years old. (Tr. at 297). According to Claimant, he experienced an intermittent burning sensation in his flanks, which occasionally resulted in nausea and vomiting. (*Id.*). Claimant was not aware of any significant renal dysfunction. (*Id.*). Dr. Beard noted that Claimant did not take any medication for his kidney condition and limited documentation was available. (Tr. at 298–99).

Dr. Beard conducted a physical examination of Claimant. (Tr. at 299). He noted that Claimant presented without ambulatory aids or assistive devices and his gait was normal. (*Id.*). Claimant could stand unassisted, arise from his seat, and step up and down from the examination table without difficulty. (*Id.*). During the assessment,

Claimant complained of bilateral flank pain. (*Id.*). Dr. Beard diagnosed Claimant with thin basement membrane disease and chronic recurrent flank pain. (Tr. at 301). According to Dr. Beard, the examination revealed some mild costovertebral angle tenderness and mild abdominal tenderness with no palpable masses. (*Id.*). Dr. Beard found no edema or evidence of renal failure on examination. (*Id.*).

On July 17, 2007, Atiya Lateef, M.D., completed a Residual Functional Capacity ("RFC") assessment. (Tr. at 331–38). Dr. Lateef's primary diagnosis was of chronic flank pain with a secondary diagnosis of thin membrane renal disease. Dr. Lateef found that Claimant had no exertional, manipulative, visual, or communicative limitations. (Tr. at 332). Claimant's postural limitations restricted him to activities that never required balancing. (Tr. at 333). Claimant's environmental limitations required him to avoid all exposure to hazards, such as machinery and heights. (Tr. at 335). Dr. Lateef reviewed Claimant's allegations, noting that he had a history of thin membrane disease and chronic bilateral flank pain. (Tr. at 338). Dr. Lateef further noted that Claimant was not taking any medications. In conclusion, Dr. Lateef found that Claimant's renal function was fairly normal with no evidence of pedal edema or end stage renal disease. (*Id.*).

On November 2, 2007, Amy Wirts, MD, completed a second RFC assessment. (Tr. at 363–70). Dr. Wirts found that Claimant had no exertional, postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 364–67). Dr. Wirts found that Claimant was only partially credible and that the alleged severity of his impairments was not well supported by the medical record. (Tr. at 368). In particular, Dr. Wirts noted that Claimant's kidney function tested normal in June 2007 and records from May 2007 included no evidence of edema or renal failure. (*Id.*). Further, Claimant's hemoglobin and hematocrit were within normal limits as of May 2007. (*Id.*).

Therefore, Dr. Wirts concluded that Claimant's physical impairments did not meet Listing criteria. (*Id.*).

### 2. Mental Health Assessments

On May 30, 2007, Lisa Tate, M.A., completed a psychological evaluation at the request of the West Virginia Disability Determination Services. (Tr. at 303–10). As part of her assessment, Ms. Tate conducted a clinical interview and a mental status examination and administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS III), and Wide Range Achievement Test, Third Revision (WRAT-3). (Tr. at 303). Claimant's chief complaints were ADHD, bipolar disorder, PTSD, and kidney problems. (Tr. at 304). Claimant discussed his health history at length with Ms. Tate. According to Claimant, he was diagnosed with ADHD when he was five years old; he no longer took medication for ADHD and had not for the previous two and a half years. (*Id.*). Claimant stated that he had difficulty completing tasks, was easily distracted, and had problems with attention and concentration. (*Id.*).

Next, Claimant discussed his history of bipolar disorder and PTSD. Claimant could not remember when he was diagnosed with bipolar disorder. (*Id.*). Further, he informed Ms. Tate that he had not taken any medication for this condition for the previous two years. (*Id.*). He described his symptoms as rapid mood fluctuations that would occur without warning. (*Id.*). Claimant also reported that he had been diagnosed with PTSD at age 15. This diagnosis was based on reports of trauma from several years of abuse during his childhood. (Tr. at 304). Claimant reported having violent impulses that he could not control, as well as nightmares and flashbacks to the abuse. (*Id.*). Crowds made Claimant feel uncomfortable, leading to tightness in his chest and difficulty breathing. (*Id.*).

Ms. Tate then reviewed Claimant's history of substance abuse and mental health treatment. (Tr. at 305). Claimant reported a history of alcohol use with no noted problems. (*Id.*). Claimant additionally admitted a history of drug abuse when he was younger and stated that drug use typically exacerbated his depression. (*Id.*). Ms. Tate noted that Claimant was not receiving any mental health treatment, but that he had previously been hospitalized several times, most recently at the age of 18. (*Id.*). Next, Ms. Tate considered Claimant's educational history and vocational background. (*Id.*). After graduating from high school, Claimant attended an electrician training program and obtained his apprenticeship license. (*Id.*). Claimant had also worked as a cook and as a dishwasher. (Tr. at 305).

Ms. Tate subsequently completed a mental status examination, observing that Claimant's mood was euthymic[2] and that his affect was broad and reactive. (Tr. at 306). Claimant's thought processes, thought content, insight, judgment, immediate memory, recent memory, concentration, and psychomotor behavior were all found to be within normal limits. (*Id.*). Claimant denied suicidal and homicidal ideation and reported no instances of hallucination or psychosis. (*Id.*).

Finally, Ms. Tate reviewed Claimant's daily activities and evaluated his functional limitations. (Tr. at 308–09). According to Claimant, he had no set sleep routine. (Tr. at 308). On a daily basis, he watched television and waited around his family's house until his mother got off of work. (*Id.*). On a weekly basis, he cleaned the house, talked to neighbors, and showered. (*Id.*). On a monthly basis, Claimant reported cooking, mowing the lawn, and spending time with friends. (*Id.*). Claimant's social functioning,

---

[2] A normal mood in which the range of emotions is neither depressed nor highly elevated.  Mosby's Medical Dictionary, 8th edition. © 2009, Elsevier.

persistence, and pace were all found to be within normal limits. (Tr. at 309). In conclusion, Ms. Tate found that Claimant was competent to manage any benefits he might receive. (Tr. at 310).

On June 29, 2007, Karl Hursey, Ph.D, completed a Psychiatric Review Technique ("PRT") at the request of the SSA. (Tr. at 313–26). Dr. Hursey found that Claimant's mental impairments were not severe. (Tr. at 313). He reviewed the paragraph B criteria and evaluated Claimant's functional limitations. (Tr. at 323). Dr. Hursey found that Claimant's activities of daily living were mildly restricted but that Claimant had no limitations on his social functioning, concentration, persistence, or pace. (*Id.*). Based on the medical record, Dr. Hursey found that Claimant had experienced one or two episodes of decompensation. (*Id.*). He determined that the evidence did not establish the presence of paragraph C criteria. (Tr. at 324). In conclusion, Dr. Hursey found that Claimant was "generally credible" based on the medical record. (Tr. at 325). Dr. Hursey observed that Claimant did not take any medication for his mental impairments and that any limitations he experienced were likely the result of physical, rather than psychological, impairments. (*Id.*).

On November 12, 2007, Debra Lilly, Ph.D, completed a second PRT at the request of the SSA. (Tr. at 371–84). Dr. Lilly found that there was insufficient evidence to evaluate Claimant's mental impairments. (Tr. at 371). Dr. Lilly noted that Claimant had not returned his self-function reports after his initial filing. (*Id.*). Although medical records indicated that Claimant had been hospitalized on July 4, 2007 after being struck with a tire iron, Dr. Lilly stated that the functional consequences of that injury could not be assessed without more evidence. (Tr. at 383).

13

### III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity, which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability,

and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. §§ 404.1520a, 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). After rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

Next, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). The regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).

In the present case, the ALJ determined as a preliminary matter that Claimant met the insured status requirement of the Social Security Act through June 30, 2008. (Tr. at 17, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since November 30, 2006, the alleged date of disability onset. (*Id.*, Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant's thin basement membrane kidney disease and secondary flank pain were severe impairments. (*Id.*, Finding No. 3). The ALJ considered Claimant's history of ADHD, bipolar disorder, and PTSD, but found these mental impairments to be non-severe. (*Id.*). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments

16

that met or medically equaled any of the impairments detailed in the Listing. (Tr. at 20, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that Claimant had the residual functional capacity to perform work limited to medium exertion. (Tr. at 21, Finding No. 5). In addition, Claimant could not climb ladders or scaffolds and could never work at unprotected heights or around hazards. (*Id.*).

The ALJ then analyzed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 23, Finding Nos. 6–10). The ALJ considered that (1) Claimant was unable to perform past relevant work; (2) he was born in 1986, and at age 20, was defined as a younger individual age 18–49 (20 CFR §§ 404.1563, 416.963); (3) he had a high school education and could communicate in English; and (4) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules framework supported a finding that Claimant was not disabled regardless of the transferability of job skills. (*Id.*). Based on the testimony of a vocational expert, the ALJ found that Claimant could make a successful adjustment to employment positions that existed in significant numbers in the national economy, such as a product packager, cleaning positions, kitchen helper, product packer, machine tender, and non-emergency dispatcher. (Tr. at 23–24). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 24, Finding No. 11).

## IV.    Claimant's Challenge to the Commissioner's Decision

Claimant contends that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in finding that Claimant's mental impairments were not severe. (ECF No. 11 at 7–10).

## V.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775. Applying this legal framework, a careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

## VI.   <u>Analysis</u>

Claimant asserts that the ALJ erred by finding Claimant's mental impairments to be non-severe. Claimant argues that the contrary is true; that is, his chronic psychiatric

conditions substantially interfere with his ability to engage in basic work activities. In support of this contention, Claimant emphasizes his health care records, which substantiate extensive mental health treatment over a period of fifteen years and include documentation of four admissions to behavioral health units or facilities. While Claimant did provide ample historical evidence of mental health treatment, the records produced predominantly reflect Claimant's psychiatric condition *prior* to the alleged disability onset date; none of these treatment records establish the state of Claimant's mental health during the relevant time frame. Further, multiple agency experts concluded that Claimant's mental impairments were either not severe or were not sufficiently active to substantiate their alleged severity. Based on the lack of mental health treatment during the relevant time period and the findings of the state agency experts, the ALJ appropriately determined that Claimant's mental impairments were not severe.

At the second step of the sequential evaluation process, the ALJ is required to evaluate the severity of a claimant's alleged impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe" impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to do basic work activities. *Id.* at §§ 404.1521(a), 416.921(a). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs."[3] *Id.* at §§ 404.1521(b), 416.921(b). An impairment is not severe when it is only "a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work

---

[3] Examples of "basic work activities" are (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

activities." SSR 96-3p (citing SSR 85-28); *see also Albright v. Commissioner of Social Sec. Admin.*, 174 F.3d 473, 478 n. 1 (4th Cir. 1999) (citing *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984)). "A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities." SSR 96-3p (citing SSR 96-7p).

In the case of a mental impairment, the ALJ determines severity by examining the claimant's limitations in the following four broad functional areas known as the paragraph "B" criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *See* 12.00C of the Listing of Impairments. When the ALJ rates the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), he uses a five-point scale: None, mild, moderate, marked, and extreme. When he rates the degree of limitation in the fourth functional area (episodes of decompensation), he uses a four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. On the other hand, a rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) results in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

Here, the ALJ reviewed the evidence and examined Claimant's limitations under the four functional categories. He determined that Claimant had only mild impairment in activities of daily living based upon the evaluation of Ms. Tate and Claimant's own descriptions of his activities around the house. Likewise, the ALJ found Claimant to have only a mild limitation in concentration, persistence and pace. According to the ALJ, Ms. Tate observed mild deficiencies in Claimant's ability to concentrate, but felt that his persistence and pace were normal. In the category of social functioning, the ALJ determined that Claimant had mild limitations. The ALJ explained that Claimant had problems as a child with fighting in school, but appeared to have outgrown that behavior. Moreover, Claimant admitted that he regularly interacted with his neighbors and saw friends on a weekly basis; accordingly, the evidence reflecting his current relationships with others did not suggest a significant limitation. Finally, the ALJ examined the record for episodes of decompensation of extended duration and found none. The ALJ noted that one non-examining consultant opined that Claimant had 1-2 such episodes; however, Ms. Tate, who personally examined Claimant, found no such episodes. Based upon Ms. Tate's opinion and the lack of records detailing episodes of decompensation on or after November 30, 2006, the ALJ concluded that Claimant's mental impairments were not severe. (Tr. at 19-20).

Clearly, the ALJ assessed the severity of Claimant's mental impairments at the proper step of the sequential evaluation process and followed the appropriate procedure in making his determination. Consequently, the issue for the Court is whether that determination is supported by substantial evidence. Having thoroughly reviewed the record, the Court does find substantial evidentiary bases for the ALJ's conclusion. According to the records, Claimant's biggest battles with his psyche occurred prior to his

eighteenth birthday. Although Claimant's IQ was measured in the above average range, he did poorly in school, was distracted and aggressive, and had temper outbursts. He was difficult for his mother to control and started to abuse alcohol and drugs. However, with the use of medications and psychotherapy, Claimant showed significant improvement over the ensuing years. At age sixteen, Claimant was admitted to an inpatient mental health facility for depression, suicidal tendencies, self-mutilation, arson, and theft. On discharge, he was placed at the Barboursville School for residential treatment. Less than a year later, Claimant was assessed as putting forth a good effort at his education and was described as a good student. He began regular treatment with Dr. Edwards and his mood started to stabilize. Claimant's hyperactivity was successfully treated with Adderall. He ultimately graduated from high school and received additional training as a machinist. The records reflect that Claimant went more than a year and a half without any major medical or psychiatric issues. Then in September 2006, Claimant was admitted to the hospital for suspected suicidal ideations after he had ingested a significant quantity of drugs. The following day, however, Claimant denied having suicidal thoughts and after undergoing a psychiatric evaluation, he was discharged to outpatient care. He had no further psychiatric admissions. During the relevant time frame, Claimant apparently functioned without psychiatric medications, psychotherapy, crisis management, or inpatient care.

In reaching his decision, the ALJ relied heavily on the findings of the consultative psychological evaluator, Ms Tate. (*Id.*). Ms. Tate was the only mental health care provider who performed a face-to-face assessment of Claimant during the relevant time period. The ALJ reviewed Claimant's history and symptoms at length and compared them to the diagnostic test results, objective evidence, and observations of Ms. Tate. (Tr.

at 18–19). The ALJ noted that Claimant had stopped taking his medication for ADHD and bipolar disorder more than two years prior to his examination by Ms. Tate and had been able to graduate from high school and complete an electrician training program in the interim. (Tr. at 19). The ALJ further noted that Ms. Tate found Claimant's psychological functioning to be within normal limits with no functional limitations. (Tr. at 306, 308). The ALJ emphasized that none of the other mental health consultants found Claimant's mental impairments to be severe. Dr. Hursey found that Claimant's activities of daily living were only mildly restricted and that Claimant had no limitations on his social functioning, concentration, persistence, or pace. (Tr. at 323). Dr. Lilly felt there was insufficient evidence to evaluate Claimant's mental impairments because no treatment records existed for the period at issue. (Tr. at 371).

Claimant would like the Court to extrapolate from his childhood history of emotional and behavioral problems that his mental impairments severely impede his ability to perform basic work activities as an adult. However, there simply is no evidence upon which to make that analytical leap. To the contrary, the lack of treatment records confirming significant and ongoing mental health issues suggests that Claimant has learned to manage his mental health conditions. Claimant does display a tendency to over indulge his use of alcohol, but that fact, alone, does not overcome the reasonableness of the ALJ's determination regarding the severity of Claimant's mental impairments or their functional impact on Claimant's ability to work.

## VII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this

matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED**:  July 30, 2012.

Cheryl A. Eifert
United States Magistrate Judge